Angela **BROUSSARD**, Individually and as Personal Representative of the Estate of Arthur Wayne Broussard, Deceased, and as Next Friend of Shane Arthur Broussard, Elli Michelle Broussard and Sarah Catherine Broussard

v.

**SABINE TOWING & TRANSPORTATION, Coastal Marine Service of Texas, The Lincoln Electric Company.**

Civ. A. No. B–87–01034–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

June 26, 1989.

---

Carl A. Parker, Port Arthur, Tex., and Wayne Reaud and Joseph C. Blanks, Reaud, Morgan & Quinn, Beaumont, Tex., for plaintiffs.

Mark Freeman, Wells, Peyton, Greenberg, Hunt & Crawford, Beaumont, Tex., for Coastal Services.

## MEMORANDUM OPINION

COBB, District Judge.

### I.

On July 1, 1987, the decedent, Arthur Wayne Broussard, was employed as a welder/shipfitter by Gulf Copper & Manufacturing. At 10:30 a.m. that day, while apparently backwelding a steel plate in the lower port coffer dam aboard the S.S. SABINE, Mr. Broussard was electrocuted.

The vessel was owned by Sabine Towing & Transportation Co., Inc. (Sabine Towing), and, at the time of the decedent's injury, the vessel was located at Sabine Towing's dock facilities, Jefferson County, Texas. Sabine Towing had contracted separately with Gulf Copper & Manufacturing (Gulf Copper) and Coastal Marine Service of Texas, Inc. (Coastal) for extensive vessel repairs. Coastal and Gulf Copper were competitors, and it was not uncommon for the two companies to be awarded repair contracts simultaneously on the same vessel. Sabine Towing requested Coastal to conduct repairs on the forward end of the S.S. SABINE as well as her cargo tanks. Gulf Copper's repair obligations extended throughout the engine room, pump room, as well as the aft end of the vessel generally. Gulf Copper performed no work on the deck; Coastal performed no work in the engine room.

On the day of the accident, the crew, consisting of Broussard, Francisco Anguiano, Manuel Ceja, Hugo Ceja and Jesus Puente, commenced work in the morning between 7:00 a.m. and 8:00 a.m. Broussard, Anguiano, Puente and Manuel Ceja later went to work in a large void space near the engine room aboard the S.S. SABINE and were in the process of replacing steel plates. At approximately 10:00 a.m., Broussard and Anguiano left the large void space to back weld the other side of a plate that had been replaced earlier that morning.

At approximately 10:15 a.m., Broussard asked Hugo Ceja to carry one of the air horns which the crew had been using that morning to the smaller coffer dam area where Broussard was to back weld the plate that had been replaced that morning. The cone-shaped air horn, which was powered by compressed air and had no moving parts, was to be situated to ventilate Mr. Broussard's work area by inducting air into the coffer dam. Hugo Ceja assisted Broussard in setting up the air horn, and once the air horn was in place, it appeared to operate properly.

Each of the co-workers confirmed that the air horn had been used that morning, it had operated properly, and no problems had been experienced with the air horn. The particular air horn had been used by Gulf Copper employees for three to four days before Broussard's injury, all without any problems.

### II.

Coastal now moves for summary judgment pursuant to FED.R.CIV.P. 56(c). According to this rule, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

Although Coastal contests many of the plaintiffs' assertions, including Coastal's ownership of the air horn, the court will limit its consideration in this motion to legally uncontroverted evidence. Assuming arguendo that the air horn did belong to Coastal, there is no evidence that the air horn was the cause of Mr. Broussard's injuries, no evidence that the air horn was defective, and no evidence that Coastal acquiesced in Gulf Copper's use of the equipment.

## A. CAUSATION

There is no evidence, credible or otherwise, that implicates the air horn as a contributing, proximate or legal cause of the death of Mr. Broussard. Plaintiff's expert, William Cronenwett, a professor of electrical engineering at the University of Oklahoma, merely asserts that the air horn "could have caused Mr. Broussard to pass out before he contacted a current source." Plaintiff's Response to Motion for Summary Judgment, Feb. 22, 1989 (Dr. Cronenwett's affidavit). An expert's opinion, however, must be based on reasonable probability; that is, more likely than not, to be admissible, and such opinions must be based on a reliable foundation, not unsupported. *Viterbo v. Dow Chemical Co.,* 646 F.Supp. 1420 (E.D.Tex.1986), *aff'd* 826 F.2d 420 (5th Cir.1987). Professor Cronenwett has not supported his present opinion with a reliable foundation, nor has he stated his opinion in terms of being a reasonable probability. In addition, Dr. Cronenwett is an electrical engineer, not an expert on ventilation, nonelectric air horns, or respiratory matters. Mr. Broussard died as a result of electrocution. The suggestion that the accident was contributed to by bad air, suffocation, toxic fumes, or a faulty air horn is mere speculation and does not rise to the level of a genuine issue of material fact as required by FED.R.CIV.P. 56(c).

## B. DEFECTIVE CONDITION

Plaintiffs' only evidence as to the inadequacy or defective condition of the air horn is contained in Professor Cronenwett's affidavit which was executed on the same day as his deposition. Cronenwett offers an opinion in affidavit form, with sweeping generalization, that the air horn was "in reasonable engineering certainty" inadequate to ventilate the cofferdam. However, at oral deposition Cronenwett testified he has never seen the air horn in question (Cronenwett depo., pp. 134, 158) or seen an identical example of such an air horn; has never measured or computed the volume of air which such an air horn could supply (Cronenwett depo., p. 156); does not know the delivery volume of the air horn or the delivery volume of the air compressor;

and does not know the volumetric capacity of the cofferdam area where Mr. Broussard was working. (Cronenwett depo., p. 157). Professor Cronenwett, when specifically asked on cross-examination at his deposition whether he had an opinion that it was more probable than not that Mr. Broussard either passed out or became dizzy before being electrocuted, had no opinion one way or the other. (Cronenwett depo., p. 135).

Cronenwett had ample time to prepare for his deposition. If Cronenwett had an opinion that the air horn itself was defective or inadequate, he should have expressed the opinion with a reliable foundation at his deposition.

## C. CONSENT OF COASTAL

Plaintiffs argue that the air horn in question was borrowed from Coastal. The verb "borrow" indicates consent of the owner, and there is a complete lack of summary judgment evidence to even infer that Coastal acquiesced to Gulf Copper's use of the air horn in the manner in which it was used. The evidence is to the contrary; John Davis testified in deposition that not only was he, as Coastal Marine's superintendent, not aware of the borrowing of the air horn, but that in this job, no lending of tools took place.

Whether the air horn was borrowed is especially critical to the claim that the air horn was merely "inadequate" for the job. Obviously, an item may be adequate for one job but inadequate for another. Without Coastal's knowledge or consent that the air horn was to be used, Coastal cannot be seen as having a duty to be sure that the air horn was used properly.

## III.

The movant's initial burden under a Rule 56 motion for summary judgment is relatively light. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party shifts the burden of production to the non-moving party by simply pointing out that the non-moving party has failed to make a preliminary showing of an essential element of his pri-

ma facie case. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Once the burden of production shifts, the non-moving party must show that there is sufficient evidence in the pre-trial record to support a plaintiff's verdict at trial and not merely that sufficient evidence exists to raise an inference to be resolved at trial. *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The court must grant summary judgment even when factual conflicts exist if the conflicts are not substantial (genuine) or if they are not legally material.

Coastal met its burden of showing that there was no evidence of several elements of the plaintiffs' case. The burden of production then shifted to the plaintiffs to produce specific facts showing that there was a genuine issue for trial. Cronenwett's affidavit contains no specific facts, merely opinions which are not supported by the facts or his answers at his deposition.

Coastal was sued by the plaintiffs on September 1, 1987. The deadline for deposing the plaintiffs' experts was January 22, 1989, and the deadline for deposing fact witnesses was December 15, 1988. The plaintiffs have had nearly seventeen months of litigation to discover evidence to raise a genuine fact issue as to Coastal. The plaintiffs have failed to do so.

Accordingly, Coastal's motion for summary judgment is GRANTED.